GENERAL ELECTRIC COMPANY, Plaintiff,

v.

William J. LYON, Blair Todd Anthony, Neils C. Kristensen, Jr., BBMC, Inc. and Lansen Mold Co., Inc., Defendants.

Civ. A. No. 94–30242–MAP.

United States District Court, D. Massachusetts.

July 21, 1995.

---

John J. Curtin, Diane M. Kottmyer, Bingham, Dana & Gould, Boston, MA, Leonard Cohen, Cain, Hibbard, Myers & Cook, Pittsfield, MA, for General Electric Company.

Christopher R. O'Hara, J. Owen Todd, Todd & Weld, Boston, MA, for William J. Lyon, Blair Todd Anthony, BBMC, Inc.

Alice E. Zaft, Cooley, Shrair, Alpert, Labovitz & Dambrov, Springfield, MA, for Neils C. Kristensen, Jr., Lansen Mold Co., Inc.

*MEMORANDUM REGARDING PLAINTIFF'S MOTIONS TO DISMISS DEFENDANTS' COUNTERCLAIM AND PLAINTIFF'S AND DEFENDANTS' MOTIONS TO AMEND COUNTERCLAIMS*

PONSOR, District Judge.

## I. *INTRODUCTION*

The defendants are two small businesses who, together with their principals, have been sued by General Electric Company ("G.E.") for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d), for unfair trade practices in violation of Mass. Gen.L. ch. 93A, and for common law deceit, breach of fiduciary obligations, civil conspiracy and conversion. In response, the defendants have filed counterclaims against GE, alleging abuse of process, tortious interference with advantageous business relations, breach of contract and violations of RICO and Mass.Gen.L. ch. 93A.

The defendants can be divided into two groups. The first, the "BBMC" group, consists of defendants William J. Lyon and Blair T. Anthony and their joint venture, BBMC, Inc. Until August, 1994, Lyon and Anthony were employees of GE's Plastic Division in Pittsfield, Massachusetts. The second, the "Lansen" group, consists of Neils C. Kristensen, Jr. and his company, Lansen Mold Co., Inc., which was both a customer of GE and a manufacturer of products for BBMC.

In essence, GE alleges that all defendants conspired to defraud GE of revenues. GE asserts that it fired Anthony and Lyon because, in express violation of company policy, they formed BBMC while they were employees of GE, stole materials from GE to use in the manufacture of products, sold these products back to GE, purchased promotional materials for their business with GE funds, and fraudulently entered into business relationships with valued GE customers. GE claims that the Lansen defendants were parties to BBMC's scheme to defraud GE.

In their counterclaims, defendants assert that Anthony and Lyon voluntarily resigned from GE after receiving assurances that no repercussions would follow from their involvement in their outside business. Defendants allege that after Lyon and Anthony resigned, GE Plastics engaged in a campaign to cause (1) harm to Lyon and Anthony's business reputation and to BBMC by coercing third parties to cease business relations with BBMC and (2) harm to Lansen by refusing to deliver essential raw materials to Lansen and by instructing authorized GE distributors that they were not to sell raw materials to Lansen.

The BBMC and Lansen defendants both allege tortious interference with advantageous business relations and violations of ch. 93A. The BBMC defendants further allege

abuse of process. The Lansen defendants further allege breach of contract and violations of the RICO statute by GE. In addition, both sets of defendants have moved to amend their counterclaims in order to provide supplementary facts. Finally, the Lansen defendants have moved to amend their counterclaim to include a claim for abuse of process.

Before the court are GE's motions to dismiss defendants' counterclaims and the defendants' motions to amend. For the reasons set forth below, all motions will be allowed in part.

## II. *FED.R.CIV.P. 12(b)(6)*

The burden is heavy on a party moving to dismiss. The appropriate inquiry is whether the non-mover is entitled to offer evidence in support of its claims. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). In deciding a motion brought pursuant to Fed.R.Civ.P. 12(b)(6), a court must look only to the allegations and, "if under any theory they are sufficient to state a cause of action in accordance with the law, a motion to dismiss … must be denied." *Knight v. Mills,* 836 F.2d 659, 664 (1st Cir.1987), citing *Melo–Tone Vending Inc. v. United States,* 666 F.2d 687, 688 (1st Cir.1981)); *accord Cuddy v. Boston,* 765 F.Supp. 775, 776 (D.Mass.1991). For purposes of these motions, the court must accept as true all the factual allegations set forth in the defendants' counterclaims and draw all reasonable inferences in their favor. *Bergeson v. Franchi,* 783 F.Supp. 713 (D.Mass.1992), citing *Correa–Martinez v. Arrillaga–Belendez,* 903 F.2d 49, 52 (1st Cir. 1990); *Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 16 (1st Cir.1989).

## III. *FACTUAL BACKGROUND*

### A. *Lyon, Anthony, and BBMC*

The counterclaim of these defendants asserts the following facts. Until August 1994, defendants William J. Lyon and Blair T. Anthony were employees of GE's Plastics Division in Pittsfield, Massachusetts. Lyon and Anthony were involved in the marketing and promotion of a unique GE product, Heavy VALOX resin. Their responsibilities included developing commercial applications for this GE product. GE routinely supported companies that were interested in developing products made from Heavy VALOX by providing advertising and marketing support, tooling and no-charge shipments of various resins. By utilizing this intensive company support, Anthony and Lyon were successful in establishing a market for GE's unique product.

In 1992, while employed at GE, Anthony and Lyon formed a company of their own, BBMC, Inc., to serve as a supplier and customer of GE. Lyon and Anthony formed BBMC as a means of developing specific commercial applications of Heavy VALOX that had previously seemed unlikely to GE management. In order to produce certain items, BBMC entered into a business agreement with Kristensen and his company, Lansen Molding. As part of its business arrangement with BBMC, Lansen agreed to mold a variety of products that BBMC would market.

The venture proved successful; BBMC's forays into dinnerware and shower "surrounds," for example, represented successful new market opportunities for the use of Heavy VALOX. In August, 1994, Anthony and Lyon were approached by GE's Director of Human Resources, Mark Chini, and queried about their involvement with BBMC, apparently because it might conflict with GE's personnel policy. According to the BBMC defendants, they were told that their involvement with BBMC was only a minor infraction of company policy. Anthony and Lyon were assured that, if they resigned and cooperated with the internal investigation, there would be no further ramifications and no civil or criminal proceedings would be brought against them.

Despite these assurances, once Anthony and Lyon resigned, GE personnel began to spread rumors that they had been fired. GE also hired a management consulting firm, the Fairfax Group, to investigate Lyon and Anthony's role in BBMC. According to the BBMC defendants, Robert Hildner of the Fairfax Group falsely represented himself as a prospective customer to Anthony and Lyon. He later revealed that he was hired by GE

and threatened that GE would make life difficult for defendants if they did not cooperate.

GE also pressured Formica Corporation to suspend its business relationship with BBMC. Formica had ordered 10,000 "Nuvel" brand colored chip samples made from Heavy VALOX from BBMC and had arranged with Lansen to manufacture these samples. In addition to its work on color chips, BBMC was also engaged by Formica to produce and promote bath and shower surround kits. Formica reconfirmed its intent to work with BBMC on this product even after Lyon and Anthony had left GE's employ. But, according to Anthony and Lyon, GE pressured Formica to stop working with BBMC on this project too. The BBMC defendants claim that in September 1994, as a result of GE's improper efforts, Formica completely terminated its business relationship with BBMC. In addition, after Anthony and Lyon resigned, GE withheld shipments of Heavy VALOX from Lansen Molding, BBMC's subcontractor. This made it impossible for Lansen to meet BBMC's production deadlines.

### B. *Kristensen and Lansen*

The following facts may be gleaned from the Lansen defendants' counterclaims.

Lansen Molding, a small family-owned business, had tested and manufactured products made from GE resins for over ten years. Lansen had a longstanding business relationship with GE, serving as one of the moldmakers to which GE recommended customers interested in using Heavy VALOX. Typically, GE would recommend to certain of its customers that they use Lansen to manufacture the tooling needed to produce the customer's product. Lansen would then order Heavy VALOX and other plastic resins for use in production, billing GE for the cost of constructing the tooling. By establishing a business relationship with GE's customers, Lansen helped to create a market for Heavy VALOX. Lansen's billing arrangement with GE and its plastics unit, Polymerland, permitted payment for raw materials thirty days after receipt.

In keeping with this arrangement, Anthony approached Lansen and arranged for it to produce coffee mugs of Heavy VALOX. Lansen produced tooling for these mugs, at a cost of over $70,000. Lansen, in keeping with prior practice, assumed that the cost of the tooling would be paid for by GE, as had other tools ordered by Anthony in the past. Only after the tooling was in production was Lansen informed that it was actually being built for BBMC directly. BBMC also engaged Lansen to build tooling for color chips for Formica. Subsequently, Formica engaged Lansen, through BBMC, to begin the production of shower surrounds made from Heavy VALOX.

Because it had already invested heavily in the toolmaking, Lansen agreed to continue production for BBMC. As was its custom with GE-supported businesses, Lansen received Heavy VALOX shipments directly from GE to use in the manufacture of the mugs. Lansen then direct-shipped these mugs to BBMC customers and to GE Plastics and its affiliates. According to Lansen, because it was direct-shipping the mugs, it allowed BBMC to use Lansen's address for customer service.

After Lyon and Anthony resigned, GE took a series of steps that made it difficult for Lansen to continue its business. First, GE demanded that Lansen turn over the tooling produced for Formica, the tooling produced for BBMC's coffee mugs, and its entire stock of Heavy VALOX. Over Lansen's objections and without compensation, GE took possession of these items, including a quantity of Heavy VALOX which Lansen had procured for other customers. GE also unilaterally changed the manner by which it had been providing raw materials to Lansen for over 10 years. In late August 1994, GE instructed its distributor of Heavy VALOX, Polymerland, to stop supplying Lansen with this plastic resin. GE informed Lansen that all orders by Lansen of other GE Plastics products would be furnished to Lansen only on a cash-in-advance basis.

Lansen attempted to acquire Heavy VALOX from other authorized GE compounders, but was informed that GE had told them Lansen was involved in wrongdoing with two

former GE employees and that they were not to sell any Heavy VALOX to Lansen. According to Lansen, certain unnamed manufacturers who did business with GE were also instructed not to deal with Lansen, under threat of retaliation. Lansen's inability to obtain Heavy VALOX made it impossible to complete its orders for customers on time. At least one of these customers, Liz Claiborne, was originally introduced to Lansen by GE for the purpose of developing market demand for Heavy VALOX.

GE is also alleged to have falsely stated to the media and to Lansen's customers that Lansen was experiencing financial difficulties and had committed wrongdoing. It is also alleged that GE contacted a financial reporting agency for the plastics industry and falsely reported that Lansen and/or Kristensen had an ownership interest in BBMC. As a result of this activity on the part of GE, Lansen's business has declined.

## IV. *DISCUSSION*

Against this factual background, the court will address the counts of defendants' counterclaims that plaintiff is seeking to dismiss.

### A. *Tortious Interference with Advantageous Business Relations*

■ BBMC's counterclaim alleging that GE tortiously interfered with its advantageous business relationship with Formica will survive the motion to dismiss. BBMC has set forth in its allegations specific facts that, if proven to be true, would establish that Formica and BBMC still maintained a business relationship after the separation of Anthony and Lyon from GE. These allegations assert that the Formica/BBMC dealings would have continued, netting a profit for BBMC, were it not for pressure exerted upon Formica by GE. BBMC has therefore pled facts sufficient to demonstrate that (1) a business relationship or prospective contractual relationship with economic benefit existed between BBMC and Formica; (2) GE knew of the existence of that relationship and intentionally interfered with it, and (3) BBMC lost the advantage as a result of GE's conduct. *See Comey v. Hill,* 387 Mass. 11, 19, 438 N.E.2d 811 (1982).

■ A claim for tortious interference with contractual or economic relations requires more than intentional conduct by the tortfeasor. *United Truck Leasing Corp. v. Geltman,* 406 Mass. 811, 812, 551 N.E.2d 20 (1990). A claimant must also establish that the intentional interference stems from improper motives or results from the use of improper means. *Id.* at 816, 551 N.E.2d 20 (citing *United Truck Leasing Corp. v. Geltman,* 26 Mass.App.Ct. 847, 852 n. 2, 533 N.E.2d 647 and cases cited); *id.* at 816 n. 8, 551 N.E.2d 20 (citing *Straube v. Larson,* 287 Or. 357, 361, 600 P.2d 371 (1979)). BBMC has alleged that GE acted with improper motive and used improper means. BBMC claims that GE management intentionally spread false rumors in the industry to the effect that Anthony and Lyon had been fired. GE's hiring of the Fairfax Group allegedly to harass BBMC may be further evidence of GE's improper motives and means. Moreover, BBMC claims that by improperly withholding heavy Valox from Lansen, BBMC's prime sub-contractor, GE injured BBMC.

GE maintains that these allegations, even if true, do not support a claim of tortious interference. GE emphatically denies that its communications with Formica were improper in motive or means, arguing that it was simply disclosing a serious deception by Anthony and Lyon to a valued customer. Similarly, GE contends that it had no ongoing contractual relationship with Lansen and that it legitimately decided to stop doing business with Lansen.

GE's account and interpretation of these business communications may prove to be persuasive once a factual record is developed. Nonetheless, resolution of a disputed issue involving BBMC's characterization of GE's motives and methods as improper cannot be decided on the pleadings. GE's motion to dismiss this counterclaim must be denied.

■ Lansen also claims that GE tortiously interfered with its advantageous business relationships. The allegations against GE include: issuing false statements to the media; instructing other businesses not to sell raw materials to Lansen; refusing to supply Lansen with essential material; removing machinery and material from Lansen's ware-

house which was not the property of GE, and inducing Formica to cancel its business relationship with Lansen. As with BBMC, Lansen has pled facts sufficient to support this counterclaim, and, therefore, GE's motion to dismiss must be denied.

GE maintains that Lansen's counterclaim should be dismissed because its conduct towards Lansen was a mere refusal to deal, not amounting to tortious interference. *See Spencer Cos. v. Chase Manhattan Bank*, 81 B.R. 194, 204 (D.Mass.1987) (citing *Allied International, Inc. v. International Longshoremen's*, 640 F.2d 1368 (1st Cir.1981), aff'd 456 U.S. 212, 102 S.Ct. 1656, 72 L.Ed.2d 21 (1982)). If that was all the counterclaim alleged, dismissal would of course be appropriate. However, Lansen's allegations entail conduct by GE that went beyond a mere refusal to deal. Lansen asserts that GE not only refused to sell Heavy VALOX to Lansen directly, but also prohibited *any of GE's authorized compounders* from selling Heavy VALOX to Lansen.

As alleged, this course of conduct might constitute substantial interference with Lansen's contractual arrangement with Liz Claiborne, at least. Moreover, Lansen contends that GE's interference with Formica's business relationship with BBMC also caused Lansen's advantageous relationship with Formica to suffer. GE's pressure on Formica to cancel its order for shower surrounds and color chips harmed Lansen. Evidence of improper motive can be found in allegations that GE provided the media with information concerning Lansen's purported ownership interest in BBMC and spread false rumors as to Lansen's financial viability. At this early stage, the court must deny GE's motion to dismiss.

B. *Violations of Mass.Gen.L. ch. 93A*

■ Chapter 93A affords a claim for relief to any entity who commits practices or acts that are "[u]nfair ... in the conduct of any trade or commerce." *Datacomm Interface, Inc. v. Computerworld, Inc.*, 396 Mass.

760, 777–78, 489 N.E.2d 185 (1986) (citing Mass Gen.L. ch. 93A, § 2(a) (1984)). In deciding whether an act or practice is unfair under Massachusetts law, courts must consider "(1) whether the practice ... is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) ... is immoral, unethical, oppressive, or unscrupulous; (3) ... causes substantial injury to competitors or other businessmen." *Id.* at 778, 489 N.E.2d 185.[1]

■ The Massachusetts Attorney General has defined an act as violating ch. 93A, § 2 if it is "oppressive or unconscionable in any respect." *Id.*, quoting 940 Code Mass.Regs. § 3:16 (1978). Although both the courts and the statutes have shied away from a precise definition of "unfair," the standard in Massachusetts has been characterized in the often quoted phrase as "a level of rascality that would raise an eyebrow of someone inured to the rough and tumble ... world of commerce." *Levings v. Forbes & Wallace, Inc.*, 8 Mass.App.Ct. 498, 504, 396 N.E.2d 149 (1979). Whether a particular practice descends to such a level is to be determined from the circumstances of each case. *Id.* at 504, 396 N.E.2d 149, citing *Don Lorenz, Inc. v. Northampton Natl. Bank*, 6 Mass.App.Ct. Adv.Sh. 933, 381 N.E.2d 1108 (1978).

■ All counterclaimants have pled sufficient facts in their 93A counterclaims to survive motions to dismiss. GE was, of course, under no obligation to act in *support* of BBMC's business efforts. Even the most jaded denizen of the rough and tumble world of commerce, however, would raise an eyebrow at a company that spread false rumors, hired a consultant to harass former employees after assuring them that there would be no reprisal, and exerted improper influence on a third party to force it to terminate a business relationship with another company. By restating BBMC's allegations, this court does not suggest they are true. However, these allegations—were they *proven* to be true—might well fall within the "penumbra" of an established concept of unfairness. As

1. In determining what constitutes an unfair act or practice under Massachusetts law, courts are to be guided by interpretations of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1) and

by regulations of the Massachusetts Attorney General. *Datacomm*, 396 Mass. at 778, 489 N.E.2d 185 (citing c. 93A, § 2(b), (c)).

the court in *Levings* explained, "[i]t does not ... require an exceptionally lively imagination to conjure circumstances under which an economically powerful business ... might act unfairly in relation to a small business." *Id.* at 503, 396 N.E.2d 149. GE's motion to dismiss BBMC's counterclaim for violation of ch. 93A will therefore be denied.

■ Similarly, Lansen's counterclaim against GE for violations of ch. 93A will also withstand plaintiff's motion to dismiss. Lansen alleges that GE's orders to its subsidiary and compounders made it impossible for Lansen to purchase raw materials essential to fulfill customers' orders. Such activity is well within the "penumbra" of "oppressive" conduct which concerned the court in *Levings*. *Id.* Further, GE's unilateral cancellation of orders placed with Lansen for Formica color chips and shower surround machinery may also be found to be suspect. The nature of GE's motivations for severing its contractual relationships with Lansen presents a question of fact that cannot be resolved on the pleadings. GE's motion to dismiss defendant's counterclaim alleging unfair trade practices will therefore denied.

## C. *Abuse of Process*

■ BBMC alleges abuse of process against GE. In order to survive a motion to dismiss this claim, BBMC must allege that GE used process for an ulterior or illegitimate purpose and that the abuse of process resulted in damage to them. *Refuse & Environmental Systems v. Indus. Services of America,* 932 F.2d 37, 41 (1st Cir.1991) (citing *Datacomm Interface, Inc. v. Computerworld, Inc.,* 396 Mass. 760, 775–76, 489 N.E.2d 185 (1986). While, even at this stage of the litigation, it appears that BBMC will face serious barriers in proving this claim, the counterclaim on its face sets forth the proper element of an abuse of process claim.

■ At this point, obviously, BBMC need not *prove* that GE's intentions were improper. Rather, it must simply plead some set of facts that would support its contention that GE's suit was brought with ulterior motives.

BBMC's allegations are that GE initiated its suit to harass, embarrass and destroy Lyon's and Anthony's reputations, with the goal of putting them out of business, thereby making an example out of them and discouraging similar outside business dealings by other GE employees. To support its contention that the suit was brought for an ulterior motive, BBMC has alleged that when GE first learned of the scope of Anthony's and Lyon's connections to BBMC, GE agreed not to pursue any litigation against them in exchange for their cooperation in an investigation of the matter. BBMC further alleges that the suit was instituted only after GE learned that Lyons and Anthony were receiving publicity for their plastics business and after they complained to G.E. that it was tortiously interfering with its business relations.

Accepting these allegations as true, they permit a reasonable inference that GE had second thoughts regarding this promise not to sue and decided to take legal action against Lyons and Anthony to make an example of its former employees. In sum, when BBMC's allegations are viewed as a whole, they assert that GE is using this suit improperly to injure BBMC and the business reputation of Lyons and Anthony. The First Circuit has recognized that the desire to injure a business or business reputation is an improper ulterior motive sufficient to state a claim for abuse of process. *Poduska v. Ward,* 895 F.2d 854, 856 (1st Cir.1990).

The alleged "ulterior motives" as set forth in the pleadings are distinguishable from GE's legitimate interests in recovering monetary damages that it believes were a result of wrongdoing on the part of Anthony and Lyon while they were employees of GE. *See Broadway Management Services v. Cullinet Software, Inc.,* 652 F.Supp. 1501, 1503 (D.Mass.1987). BBMC has alleged facts that, if proven, would tend to show that GE used legal process to gain some collateral advantage not properly a part of the proceedings. *Id.* (citing *Cohen v. Hurley,* 20 Mass.App. 439, 442, 480 N.E.2d 658 (1985)).[2]

**2.** It should be noted that other allegations do not support an abuse of process claim. Activity by

an outside consultant, for example, and telephone calls by outside counsel on an unrelated

Lansen also seeks to amend its counterclaim to add a claim for abuse of process. Lansen, like BBMC, alleges that GE filed suit against it to destroy its reputation and put it out of business. Lansen asserts that GE spread false rumors that Lansen was involved in wrongdoing, that GE made false statements to the media concerning Lansen's financial condition, and that GE falsely reported to a financial reporting agency that Lansen held an ownership interest in BBMC. These factual allegations, while rather thin, nonetheless tend to show that GE intended to injure the Lansen business and support a permissible inference that GE had an ulterior motive behind its use of process, quite separate and apart from its legitimate goal of recovering monetary damages.

The fact that GE's claim against Lansen is anchored on the reasonable assumption that defendants may have participated in the wrongdoing perpetrated by Anthony and Lyon does not in itself preclude a claim for abuse of process. Proof of groundlessness is not an essential element of a claim for abuse of process. *Fishman v. Brooks,* 396 Mass. 643, 652, 487 N.E.2d 1377 (1986). *See also Quaranto v. Silverman,* 345 Mass. 423, 426, 187 N.E.2d 859 (1963).

In sum, there are adequate factual allegations to support Lansen's abuse of process claim. Whatever infirmities there may be in the evidence supporting the claim can be explored, if appropriate, in a motion for summary judgment.

## D. *RICO*

Lansen alleges that GE conspired with its subsidiary and its authorized compounders to prevent Lansen from purchasing Heavy VA-LOX in violation of the RICO statute, 18 U.S.C. § 1962(c). GE's motion to dismiss this counterclaim will be granted, as Lansen has failed to plead any set of facts that would support a RICO violation. Lansen fails to allege facts that would support two of the statute's critical elements: 1) illegal acts committed by a "person" in support of the improper activities of an "enterprise" and 2) a "pattern of racketeering activity."

A person whose business or property has been injured as a result of a violation of RICO may bring a private right of action. *See* 18 U.S.C. §§ 1962 and 1964. In order to state a RICO claim, defendants must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity" and must also show injury to their business or property. *Arzuaga–Collazo v. Oriental Federal Sav. Bank,* 913 F.2d 5, 5–6 (1st Cir.1990) (citing *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985)). The pertinent provision of RICO states that "[i]t shall be unlawful for any person employed by or associated with any enterprise" to conduct the enterprise's affairs through such a pattern. 18 U.S.C. § 1962(c).

Lansen alleges that, in order to drive it out of business, GE violated RICO by conspiring with its subsidiary, Polymerland, and engaging in acts of mail and wire fraud to deprive it of a raw ingredient essential to its manufacturing process. There are cases where the parent company and its subsidiary have been considered the "enterprise" under RICO, *see Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162, 1165 (3rd Cir.1989). However, the statute requires that a "person" commit the illegal acts that form the basis of the RICO suit to support the improper activities of the larger "enterprise." *See Miranda v. Ponce Fed. Bank,* 948 F.2d 41, 44–45 (1st Cir.1991) (citing *Arzuaga–Collazo v. Oriental Fed. Sav. Bank,* 913 F.2d 5, 6 (1st Cir.1990)). "[T]he unlawful enterprise itself cannot also be the person the plaintiff charges with conducting it." *Id.; see also, Odishelidze v. Aetna Life & Casualty Co.,* 853 F.2d 21, 23 (1st Cir.1988). Under this reading of the statute, in order to sustain a valid claim under RICO, Polymerland must be read to be the "person" and GE the "enterprise." Lansen fails to allege any ac-

matter are not evidence of improper motives as to GE's efforts to recover damages from its former employees. Further, the mere fact that BBMC must spend time and money defending itself against GE's claim does not evidence any improper purpose. *Broadway Management,* 652 F.Supp. at 1503.

tivity upon the part of Polymerland which would constitute a violation of RICO. Therefore, Lansen has failed to plead a set of facts sufficient to survive GE's motion to dismiss on this count.

■ Further, Kristensen and Lansen have failed to allege any activities on the part of either GE or Polymerland that would constitute a "pattern of racketeering" under RICO. A "pattern of racketeering activity" consists of the commission of at least two predicate acts, as defined in section 1961(1). *Sedima,* 473 U.S. at 495, 105 S.Ct. at 3284. In order for a defendant's alleged actions to qualify as predicate acts, the defendant's conduct must be sufficiently culpable to permit indictment under one or more of the criminal laws specified in the statute. *Feinstein v. Resolution Trust Corp.,* 942 F.2d 34, 42 (1st Cir.1991).

■ Lansen alleges that GE's use of the mails and telephone to prevent it from purchasing a raw material essential to its manufacturing process was a violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud), illegal activities that satisfy the requirement of predicate acts under the statute. However, Lansen fails to allege any activity on the part of GE that would be indictable under sections 1341 or 1343. To allege mail or wire fraud, a plaintiff must offer facts sufficient to establish the existence of a scheme to defraud, the intent to defraud, and the use of the mails or wires to further such a scheme. *United States v. Brien,* 617 F.2d 299, 307 (1st Cir.1980) (citing, e.g., *Gold v. United States,* 350 F.2d 953, 956 (8th Cir.1965) (other citations omitted)). This requires the false representation of a material fact, known to be false and made for the express purpose of inducing action. To sustain a claim, the injured party must show that it relied upon the representation as true and acted on the basis of the misrepresentation to its detriment. *Metropolitan Life Ins. Co. v. Ditmore,* 729 F.2d 1, 4 (1st Cir.1984) (citations omitted).

■ Here, the facts offered by defendants do not fulfill the requisite elements of an action for mail or wire fraud. There are no allegations that GE made any false representation to *Lansen* upon which *it* relied to its detriment. GE's course of conduct, even accepting that it was unfair and untruthful, does not constitute activity indictable under sections 1341 and 1343.

■ Further, under Fed.R.Civ.P. 9(b), allegations of fraud must be pled with particularity, stating "the time, place and content of the alleged mail and wire communications perpetrating that fraud." *Feinstein,* 942 F.2d at 42 (quoting *New England Data Services, Inc. v. Becher,* 829 F.2d 286, 290 (1st Cir.1987)). Lansen has failed to plead its allegations of fraud with sufficient specificity to meet this requirement. GE's motion to dismiss this count will therefore be allowed.

### E. *Breach of Contract*

■ Lansen has also offered a counterclaim against GE for breach of contract, claiming that Lansen and GE had an established contractual relationship for purchase and delivery of goods for sale and for the design and manufacture of molding machinery. Lansen asserts that this contractual relationship was breached when GE instructed its subsidiary, Polymerland, not to sell Heavy Valox to Lansen.

Lansen does not claim that a written contract existed between the parties. The breach of contract is based only on a theory that the course of dealings between Lansen and GE formed a contract implied-in-fact. An implied-in-fact contract would only exist in this case if: (1) Lansen conferred a measurable benefit on GE, (2) GE accepted services from Lansen with the expectation of compensating Lansen and (3) Lansen could demonstrate that it provided services with the reasonable expectation of receiving compensation from GE. *Bolen v. Paragon Plastics, Inc.,* 747 F.Supp. 103 (D.Mass.1990), citing, *e.g., Katz v. Silin,* 349 Mass. 648, 212 N.E.2d 226 (1965); *see also, Prescott v. Morton International, Inc.,* 769 F.Supp. 404, 410 (D.Mass.1990), quoting Farnsworth, Contracts § 3.10 at 1214 (1982).

Here, there was a series of individual contractual transactions between GE and Lansen covering a period of years. Lansen, however, has alleged no set of facts that

would allow the inference that this collection of discrete transactions was actually an exchange of promises between it and GE, forming an implied contract to do business with each other under the same conditions in perpetuity. Absent such allegations, there is no factual support for such a contractual relationship. GE's motion to dismiss Lansen's counterclaim for breach of contract will therefore be allowed.

### V. *CONCLUSION*

For the foregoing reasons, this court hereby DENIES plaintiff's motion to dismiss the counts in defendants' counterclaims for tortious interference with advantageous business relationships, violations of ch. 93A and abuse of process. GE's motion to dismiss the counts in Lansen's counterclaim for violation of RICO and breach of contract is ALLOWED. The defendants' motions to amend are ALLOWED.